UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

In the Matter of:

                                                  Case No. 12-61274

Hudson Brick Yard, Inc.,                              Chapter 7
                                                  Hon. Walter Shapero

      Debtor.

_____/

### OPINION REGARDING FIRST FEDERAL BANK OF THE MIDWEST'S MOTION FOR RELIEF FROM STAY

#### INTRODUCTION

First Federal Bank of the Midwest, a secured creditor of the Debtor Hudson Brick Yard, Inc., has moved for relief from stay with regard to its security interest in the Debtor's assets. Several third parties claim superior interests in some of these assets. The Court grants the motion for relief from stay in part and denies it in part.

#### BACKGROUND

Hudson Brick Yard, Inc. ("Debtor") was an entity organized under Michigan law in 1989 that sold building materials, landscaping materials, furniture, and lawn decorations, both to individual consumers and to contractors. Carl Brittain and Heidi Brittain (collectively "the Brittains"), are a married couple and its sole shareholders and day to day managers. In April 2007, Debtor borrowed money from Bank of Lenawee and signed a promissory note that was guaranteed by the Brittains. Bank of Lenawee's interests were secured by Debtor's assets, to wit: its accounts, inventory, equipment, and general intangibles. On April 10, 2007, Bank of Lenawee filed a UCC Financing Statement perfecting its secured interest in these assets. In May

1

2007, Debtor borrowed additional money from Bank of Lenawee, which in substance became part of the April 2007 obligation.  Testimony indicated that the realty on which Debtor's business was operated was owned individually by the Brittains, possibly subject to one or more liens.

In March 2008, Bank of Lenawee merged into First Federal Bank of the Midwest ("FFB") and began operating under that name.  In August 2008, Debtor and FFB entered into a new loan transaction, incident to which the initial loan was paid off, and which similarly was secured by Debtor's accounts, inventory, equipment, and general intangibles.  A similar loan renewal transaction took place in January 2010.  At the time, the parties were apparently unaware of the fact that Debtor's corporate entity had been automatically dissolved by State of Michigan on July 15, 2009 for failure to file annual reports, and Debtor's business proceeded in normal course. Heidi Brittain testified that she and her husband became aware of the dissolution in January 2012 when they attempted to procure insurance for the business.  Their way of dealing with the matter was that on March 20, 2012, the Brittains individually filed a Certificate of Assumed Name with the Jackson County Clerk, stating they were doing business under the name "Hudson Brick + Stone,"  a variation of the corporate name.  Heidi Brittain testified that she did not change the business' sign or advertisements to reflect the difference between the name on the Assumed Name Certificate and the corporate name of the dissolved entity.  However, none of the parties argue that this state of affairs as to the corporate identity's existence or status substantively or legally affect the rights and interests being disposed of in this proceeding.

In 2012, FFB filed suit in state court against Debtor for failure to make loan payments.  In March 2012, FFB filed an amendment to the previously filed UCC Financing Statement in which

2

FFB replaced Bank of Lenawee as the secured creditor. That Court issued an order permitting FFB to take possession of its collateral, which it did on or about June 29, 2012. FFB engaged an auctioneer, who together with agents of FFB, entered Debtor's premises and examined its assets. The auctioneer prepared those assets for auction, separating and excluding the documents and records he found on the premises. Debtor filed its Chapter 7 bankruptcy on September 20, 2012, which stayed the auction that had been scheduled for two days later.

FFB then moved for relief from the automatic stay so it could proceed with its remedies against Debtor, including the scheduled auction. Various third parties claimed interests in certain assets of Debtor that could potentially be superior to the interests of FFB, primarily based on claims they had purchased and paid for such but had not yet obtained possession. FFB does not now contest the claims of several of the third party claimants, to wit: Sheryl Flores, Ron Jansen, June Roche, and Cherrie Kehoe. As to those, this Court denies FFB's motion for relief from stay with regard to the specific assets claimed and finds that each such person is entitled to possession of and title to the assets free and clear of any FFB claims of interest. FFB contests several third party claims, to wit, those of: James Austin, Helga Austin, Tammy O'Shea, William Bendley, Jr., Mike Loomis, Rhonda Loomis, Jessica O'Shea, John Spink, Gary Spink, and Nite Lites of Jackson, LLC. These parties (collectively, the "Claimants"), pursuant to a procedure established by the Court, filed their claims and were all represented by the same counsel. The Court held an evidentiary hearing and took evidence.

## JURISDICTION

This Court has jurisdiction under 28 U.S.C. §§ 1334(b), 157, and E.D. Mich. L.B.R. 83.50(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

3

<u>**DISCUSSION**</u>

<u>General Principles Governing Priority of Interests</u>

Pursuant to 11 U.S.C. § 362(g), the party opposing relief from stay has the burden of proof

on all issues, other than the debtor's lack of equity in the property, which is not at issue here.

That burden of proof is by a preponderance of the evidence.  <u>In re Anderson</u>, 1992 WL

12004366 at *2 (Bankr. S.D. Ga. 1992).

Generally, there are two ways by which a Claimant arguably would be able to take title to

the contested assets free of FFB's perfected security interest.  First, pursuant to M.C.L. §

440.9320(1),[1] "a buyer in ordinary course of business, other than a person buying farm products

from a person engaged in farming operations, takes free of a security interest created by the

buyer's seller, even if the security interest is perfected and the buyer knows of its existence."

M.C.L. § 440.1201(9) defines "buyer in ordinary course of business" as:

> <u>a person that buys goods in good faith, without knowledge that the sale violates</u>
> <u>the rights of another person in the good, and in the ordinary course from a person,</u>
> <u>other than a pawnbroker, in the business of selling goods of that kind.</u>  A person
> buys goods in the ordinary course if the sale to the person comports with the usual
> or customary practices in the kind of business in which the seller is engaged or
> with the seller's own usual or customary practices…  A buyer in ordinary course
> of business may buy for cash, by exchange of other property, or on secured or
> unsecured credit, and may acquire goods or documents of title under a preexisting
> contract for sale.  Only a buyer that takes possession of the goods or has a right to
> recover the goods from the seller under article 2 may be a buyer in ordinary
> course of business.  A person that acquires goods in a transfer in bulk or as
> security for or in total or partial satisfaction of a money debt is not a buyer in
> ordinary course of business.

---

[1] All Michigan statutes cited in this opinion refer to the versions existing as of the date of the events in question, and not the amended versions effective July 1, 2013, which in any event are substantively identical.  <u>See</u> 2012 Mich. Legis. Serv. P.A. 87 (H.B. 5082).

4

(emphasis added) (footnote omitted).  Second, in consignment transactions, "while the goods are in the possession of the consignee, the consignee is deemed to have rights and title to the goods identical to those the consignor had or had power to transfer."  M.C.L. § 440.9319(1).  Pursuant to M.C.L. § 440.9102(t), consignment is defined as

> a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and that meets all of the following: (i) The merchant deals in goods of that kind under a name other than the name of the person making delivery, is not an auctioneer, and is not generally known by its creditors to be substantially engaged in selling the goods of others.  (ii) With respect to each delivery, the aggregate value of the goods is $1,000.00 or more at the time of delivery.  (iii) The goods are not consumer goods immediately before delivery.  (iv) The transaction does not create a security interest that secures an obligation.

In this case, other than the one situation involving an alleged consignment, the issue is whether or not each of the Claimants bought in good faith, without knowledge that the sale violated the rights of another person in the subject goods, from a person in the business of selling goods of that kind.[2]  "Good faith" is statutorily defined as "honesty in fact in the conduct or the transaction concerned."  M.C.L. 440.1201(19).  That test is a subjective one, i.e.: one that looks into the state of mind of the purchaser, not what a state of mind of a prudent man should have been.  <u>Karibian v. Paletta</u>, 122 Mich. App. 353, 359 (1983).

The Individual Contested Claims

<em>John Spink</em>

John Spink had purchased an ordinary tractor from a home improvement store for $999.00 and customized it to resemble a classic Ford.  He then placed it on Debtor's premises around

---

[2] FFB argued that the various items at issue were commingled with the remainder of Debtor's assets and that, pursuant to M.C.L. § 440.9320, FFB's security interest attaches to the whole of the commingled mass.  However, because that statute governs issues of *competing* security interests, it is inapplicable here.

5

mid-2011, when it was still in business, for the purpose of exposing it as being for sale. He testified that he entered into a verbal agreement with the Brittains wherein (a) the tractor would be placed on Debtor's premises, which generated foot traffic of customers and (b) if any person expressed interest in the tractor, the Brittains would put that person into contact with him. John Spink testified he wanted to sell the tractor for the approximate price of $2,200. He had previously attempted to market it from his own rural property but was unsuccessful. The record is unclear as to whether there was any descriptive sign placed on it. There were no offers to purchase the tractor, which was on Debtor's premises at the time of the bankruptcy filing. Neither John Spink nor Debtor was in the business of selling such an item.

FFB argues that John Spink was a consignor and Debtor was a consignee, and because John Spink failed to perfect a security interest by filing a UCC Financing Statement, his interest is junior to that of FFB. The applicable statute, as noted, defines a consignment as "a transaction, regardless of its form, in which a person delivers goods to a merchant *for the purpose of sale*[.]" M.C.L. § 440.9102(t) (emphasis added). The Court construes the indicated statutory language of "for sale" to mean that the consigned goods or items were delivered to the consignee for purposes of sale by the consignee on behalf of the consignor. FFB's argument might be correct if this arrangement was a true consignment. However, the Court finds that is not the case here. The Court is persuaded by John Spink's testimony that neither Debtor, nor its principals nor agents had any authority (whether express or implied) to actually itself sell the tractor on his behalf. The Court factually concludes that the purpose of this arrangement was to expose and, in essence, to advertise, the availability of the tractor for purchase from the owner, John Spink, and that only he possessed the right to entertain an offer for its purchase. Further, there was no

6

indication from the record that Debtor engaged in any conduct that would cause third parties to believe that it had the authority to sell the tractor on anybody's behalf. At most, it would refer any inquiries about the tractor to John Spink. In addition, Debtor was not a merchant of such goods. These facts preclude the creation of a consignment, and because FFB makes no other argument as to why it has rights to the tractor that are superior to John Spink, FFB's motion for relief from stay is denied with regard to it.

### *Nite Lites of Jackson, LLC*

Nite Lites of Jackson, LLC ("Nite Lites") (which offered testimony through John Spink, its principal) operated a seasonal Christmas light show on the Jackson County Fairgrounds. That show included a drive-thru and a large indoor display. Nite Lites purchased from Debtor, paid for, and obtained a receipt for a substantial quantity of decorations, to wit:

> All x-mas in and around the first cubby section in back area – Also to include office area Gifts + Christmas/easter/Thanksgiving to include all gifts in that area. Also to include all Thanksgiving in and around cubby in first section. Also big Soldiers in Barn 2 + U.D. deer and other misc Gifts in Barn.

(Exh. 14). The receipt is dated December 30, 2011 and states that Nite Lites paid $3,500 cash. It was testified that Debtor often sold both decorations and ornaments of this sort, as well Christmas decorations, in its ordinary course of its business. John Spink testified that the Easter and Thanksgiving decorations were purchased because he "believed he was getting a deal" on them, though they were not germane to Nite Lites' more Christmas-focused business. According to the receipt, Nite Lites had until the following September to pick up these items. It did not do so before the bankruptcy filing and subsequent events.

7

Nite Lites argues it was a buyer in the ordinary course. FFB argues that Nite Lites was not a buyer in the ordinary course of business because it purchased Debtor's *entire* holiday inventory in bulk and at favorable prices, which included non-Christmas decorations for which Nite Lites would have no use in its normal business.

Nite Lites' principal, John Spink, had known the Brittains for approximately 40 years and paid cash for the goods with the understanding that he would be able to pick them up sometime thereafter. Debtor typically allowed for buyers to store their purchased property on its premises, often for years at a time. There is no indication that either Nite Lites or John Spink had knowledge that the purchase violated the rights of FFB. FFB argues that because Debtor's ordinary business was selling goods to landscapers and end-user consumers and that, because Nite Lites was neither, Nite Lites likely intended to resell the goods in a manner that would be outside the ordinary course of business. In support of this, FFB relies on Debtor's purported statement at its 341 hearing that Nite Lites intended to open a second-hand resale shop along with its existing business. This supposed statement was not introduced as part of the record before the Court, and the evidentiary hearing Nite Lites' principal denied that he intended to re-sell the items. FFB also argues that because Nite Lites benefitted from favorable pricing, the transaction represented Debtor's liquidation or an attempt to avoid bankruptcy. The Court finds that the facts in the record do not support this assertion, particularly as Nite Lites was buying Christmas and Thanksgiving decorations on December 30 for use during the next year's holiday season and the testimony indicated that Debtor typically at least partially suspended its business after the holidays until about March. It stands to reason that the discounts were attributable to timing, rather than Debtor's selling off of assets. John Spink testified that he was unaware

8

Debtor was in any financial distress.  Lastly, a buyer "buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the *seller* is engaged or with the *seller's* own usual or customary practices."  M.C.L. § 440.1201(9) (emphasis added).  Thus, it is of no importance that Nite Lites purchased goods other than Christmas decorations that may have been outside *its own* ordinary course of business, as long as the *seller* was in the business of selling such goods.  Nite Lites testified, and the Court is persuaded that, Debtor regularly sold lawn decorations and other ornaments of the type at issue in the ordinary course of its business.  Based on the facts, the Court concludes that John Spink (a) bought the subject goods from Debtor, who is in the business of selling such, and bought them in the ordinary course of Debtor's business; and (b) bought them in good faith and without knowledge that the sale violated the rights of FFB, if indeed the sale violated any such rights.  Therefore, FFB's motion for relief from stay is denied with regard to the aforementioned items.

## *Gary Spink*

Gary Spink periodically performed repair work for Debtor (though he was not an employee) and made purchases from it.  He performed repair work between January 11, 2012 and April 25, 2012 and purchased building materials from Debtor for a personal project of building a retaining wall, against the price of which he was given a credit for the value of his labor for the agreed-upon sum of $1,500.  The price of his $3,440 purchase was thus reduced to $1,940, which he paid to Debtor in cash.  He obtained a receipt for this transaction dated May 10, 2012, which identified the seller's identity as "Heidi S. Brittain / Hudson Brick + Stone."  He expected the materials to be delivered by Debtor at some point, though Gary Spink was not in a rush to obtain the materials because, as he testified, they would be used for a building project that was a low

9

priority to him.  The delivery had not occurred as of the bankruptcy filing.  Gary Spink testified

that he had previously made purchases from Debtor, sometimes trading his repair services and

preferring to deal in cash for payment.  He testified that he was not aware of Debtor's financial

distress or any intent to file bankruptcy.

FFB argues Gary Spink was not a buyer in the ordinary course of business because he

purchased these items at very favorable prices (approximately 20% of market value, according to

FFB's arithmetic).  There was no evidence that Gary Spink did not buy in good faith and in the

ordinary course other than that he, by his own admission, got a "good deal."  The price of the

goods may be relevant evidence in deciding the issue of good faith, but it is not conclusive in and

of itself and must be considered along with the other facts in determining the good faith issue.

Karibian, 122 Mich. App. at 359.  There were no other facts that tend to indicate Debtor made

this sale as part of a liquidation or an attempt to avoid bankruptcy.  Based on the facts, the Court

concludes that Gary Spink (a) bought the subject goods from Debtor, who is in the business of

selling such, and bought them in the ordinary course of Debtor's business; and (b) bought them

in good faith and without knowledge that the sale violated the rights of FFB, if indeed the sale

violated any such rights.  As no other arguments were asserted by FFB, its motion for relief from

stay is denied.

### *William Bendley Jr.*

William Bendley Jr. ("Bendley") transacted business with Debtor and the Brittains for about

ten years.  Periodically, he would make deliveries for Debtor and was compensated, though he

was not a formal employee.  He testified that he bought his stone supplies exclusively from

Debtor.  A receipt reflects his cash purchase of materials on May 15, 2012 from "Hudson Brick"

10

in the amount of $1,100, less $850 for credit for deliveries he made. (Exh. 15). Another receipt reflects his cash purchase of materials on May 30, 2012 from Hudson Brick + Stone for the amount of $493. (Exh. 16). These receipts identify the quantities of all the various items purchased, as well as the brands and colors of particular items. Bendley testified that some of the materials were purchased in conjunction with his landscaping and excavation business and some was perhaps purchased for personal use. He believed he was getting a "good deal" on these purchases. He had a habit of paying cash for materials, though Debtor did not require it. Bendley did not pick up these items from Debtor, which was in conformity with his practice of buying materials and leaving it on Debtor's premises until he needed them. Bendley testified that he continued to store on the premises materials that he had purchased as far back as 2004 or 2005 with the understanding that he would remain free to obtain them at a later date. The purchased materials were not marked nor segregated from the rest of Debtor's inventory. He testified that he was unaware of Debtor's financial problems.

FFB argues Bendley was not a buyer in the ordinary course of business because he purchased these items at very favorable prices and was aware that Debtor had taken on the new identity of Hudson Brick + Stone. FFB argued that Bendley could not be a buyer in the ordinary course because he bought at extremely low prices (approximately 15-20% of market value). Bendley testified that such materials have an approximate market value of about $3 to $4 per square foot, which would translate to approximately $7,500, rather than the $1,593 he was actually charged. Though Bendley testified as to his personal experience as a career excavator and landscaper, he further testified that he had only purchased such materials from Debtor. There was no evidence that Bendley did not buy in good faith and in the ordinary course other

than that he, by his own admission, got a "good deal," which, in the Court's opinion, does not prevent him from being a buyer in the ordinary course. As previously noted, the price of the goods may be relevant evidence in deciding the issue of good faith, but it is not conclusive in and of itself and must be considered along with the other facts in determining the good faith issue. Karibian, 122 Mich. App. at 359. There were no other facts that tend to indicate Debtor made this sale as part of a liquidation or a desperate attempt to avoid bankruptcy. Bendley had regularly dealt with Debtor and the Brittains and had known them for years. There was no indication that he was aware of FFB's rights in Debtor's inventory. If he had any vague or general awareness of "problems" stemming from the identity of the seller as listed on his receipt, such appears to have begun *after* he made the purchases and, in any event, does not preclude a finding of good faith on this inquiry as a whole. Considering these facts, the Court concludes that Bendley (a) bought the subject goods from Debtor, who is in the business of selling such, and bought them in the ordinary course of Debtor's business; and (b) bought them in good faith and without knowledge that the sale violated the rights of FFB, if indeed the sale violated any such rights. As no other arguments were asserted by FFB, its motion for relief from stay is denied.

### *Mike Loomis, Rhonda Loomis, and Jessica O'Shea*

Three Claimants, Mike Loomis, Rhonda Loomis, and Jessica O'Shea, did not appear at the evidentiary hearing. Instead, Heidi Brittain, as principal of Debtor, offered facts relevant to their claims. FFB's objected but later waived its objection to her testimony in that regard.

On June 14, 2012, Mike Loomis purchased, but did not obtain possession of, various materials for personal use in the amount of $1,043.04 in two separate cash payments. Heidi

12

Brittain testified that she gave him a "good price" because a person who had originally intended to buy those same materials backed out of the planned transaction and because she did not want the materials to remain unsold for a long time thereafter. She testified that, as far as she could remember, the failed prior transaction would have been for prices that were significantly above the invoice price that Debtor had paid for the inventory (as little as a 33% markup and as much as a 73% markup). However, she testified that the price given to Mike Loomis was below invoice (as little as 26% below and as much as 45% below). She testified that Debtor did not always sell at the "retail price" in instances where somebody had previously backed out of an agreed-upon purchase. Mike Loomis argues he was a buyer in the ordinary course of business. There was no evidence that he did not buy in good faith and in the ordinary course other than that he, by the seller's own admission, got a "good deal." There were no other facts that tend to indicate Debtor made this sale as part of a liquidation or a desperate attempt to avoid bankruptcy. His preferential pricing appears to be the result Debtor's desire to sell the materials quickly after the originally intended buyer fell through. His receipt indicates both quantity terms and reasonable descriptions. (Exh. 24). As above noted, the price of the goods may be relevant evidence in deciding the issue of good faith, but it is not conclusive in and of itself and must be considered along with the other facts in determining the good faith issue. <u>Karibian</u>, 122 Mich. App. at 359. Considering these facts, the Court concludes that Mike Loomis (a) bought the subject goods from Debtor, who is in the business of selling such, and bought them in the ordinary course of Debtor's business; and (b) bought them in good faith and without knowledge that the sale violated the rights of FFB, if indeed the sale violated any such rights. FFB's motion for relief from stay is denied with regard to the aforementioned items.

13

Rhonda Loomis, who is Mike Loomis' wife, was formerly employed by Debtor some two to three years ago. She bought materials from Debtor on June 20, 2012, both for personal and for business use, for the cash amount of $1,537. Among the various materials reflected on the receipt was "All Classic Stone in boxes in warehouse." (Exh. 25). Heidi Brittain testified that "Classic" was a manufacturer who had apparently initially tendered inventory to Debtor on consignment, directing Debtor to sell it on its behalf. She testified that Classic never came to retrieve their unsold materials, despite her request that it do so. Because these materials were left on Debtor's premises for over two years, Debtor apparently deemed it abandoned and sold it to Rhonda Loomis. Apparently neither Debtor nor the Brittains ever paid Classic for the materials. Classic had submitted a bill to Debtor, which would indicate, given the passage of time, that whatever was the original arrangement between Debtor and Classic, it became a sale to Debtor. Heidi Brittain also testified that she informed Rhonda Loomis about Debtor's insolvency issues. Rhonda Loomis argues that she was a buyer in the ordinary course of business. The Court finds that Rhonda Loomis was not a buyer in the ordinary course of business due to (a) her knowledge of Debtor's insolvency situation, which could (or should) have made her aware of a secured creditor's rights to the materials; and (b) the issue of Classic's rights to the materials, if any, which would negate the good faith requirement. Her knowledge of either or both of these issues, which the Court finds to be more likely than not, would prevent her from being a good faith buyer in the ordinary course. Rhonda Loomis has not met her burden of proof in opposing FFB's motion for relief from stay for the Classic stone or the other materials referred to by the receipt.

14

Jessica O'Shea, who is Heidi Brittain's granddaughter, purchased stone materials for $150 in cash (plus tax) from "Hudson Brick + Stone" as reflected on her receipt dated June 21, 2012. (Exh. 26). These materials were not segregated, nor did she pick them up prior to the bankruptcy filing. She was a regular customer and had previously worked for Debtor briefly, though there was no clear indication she was aware of its legal or financial issues. The Court finds that she is not a buyer in the ordinary course of business. Heidi Brittain's testified that "she's my granddaughter, I gave her a hell of a buy" and that the sale price was not the retail or wholesale price, but rather the "granddaughter price." The discounted sale is distinguishable from the other similar transactions because (a) it was established that the discount was primarily given based on the buyer's identity as a family member of the Brittains, and (b) the discount was not justified by sufficient economic or business reasons. Thus this transaction was not in the ordinary course of the seller's business. FFB's motion for relief from stay is granted with regard to the purchased materials.

Jessica O'Shea's receipt also referenced an air conditioner unit belonging to her. According to Heidi Brittain, Jessica O'Shea purchased this air conditioner from Sam's Club. It was unboxed and has a red sales tag on it. It was placed by Heidi Brittain on Debtor's premises temporarily because the vehicle used for its transport needed to be used for another purpose in conjunction with Debtor's business. However, FFB retook the premises before Jessica O'Shea could obtain possession of the air conditioner. The receipt's reference to the air conditioner, according to Heidi Brittain, was made so that if Debtor's delivery agents ever delivered Jessica O'Shea's stones, they would also know to also deliver the air conditioner. Heidi Brittain testified that Debtor deactivated its central air conditioning units in several areas of the premises,

15

in an effort to save on energy costs. Debtor maintains no interest in this item, while there was no receipt or proof of Jessica O'Shea's purchase of the air conditioner, the Court is persuaded by Heidi Brittain's testimony that the air conditioner was purchased as indicated by Jessica O'Shea and finds by a preponderance that it is the property of Jessica O'Shea and was never inventory or equipment of Debtor. As such, FFB's motion for relief from stay is denied with regard to it.

*James and Helga Austin*

James Austin is the father of Heidi Brittain. He and his wife, Helga Austin (collectively, "the Austins"), filed claims for various vehicles used by Debtor and materials they allegedly purchased from Debtor. The Austins were admittedly aware of the adverse financial situation faced by Debtor and the Brittains. They entered into an arrangement in which the Austins paid several of Debtor's debts in an effort to help it avoid foreclosure or bankruptcy and were compensated with transfers (or attempted transfers) of Debtor's assets. The Austins paid $17,542 directly to Advantra for a purported credit card debt owed by Debtor and/or the Brittains. They also wired sums to the mortgagee of Debtor's premises, Zions First National Bank, in an amount determined sufficient to help Debtor avoid foreclosure. The receipt of this transaction stated "To pull out of Foreclosure – made up with equipment[.]" James Austin testified that he and his wife entered into what they termed "lease" transactions whereby he paid these debts and Debtor and/or the Brittains would repay him on a monthly basis. These transactions were of an informal nature and not well documented. There exists some ambiguity as to whether these transactions in substance were intended to be lease or sale transactions.

The titles to three vehicles used by Debtor were at some point transferred to either James Austin or the Austins together. These transfers appeared to be part of the consideration for the

16

Austins having paid Debtor's debts. James Austin testified that he never obtained possession of the vehicles and, although he expected repayment, he did not receive it. He did not exercise his rights to sue for the outstanding balances or to repossess the vehicles.

The first vehicle is a 1999 Dodge Ram truck, which in 1999 was titled to "Hudson Brickyard" and for which Bank of Lenawee was listed as the first secured party. Bank of Lenawee (and FFB as its later successor) thus attached and perfected its security interest to the vehicle in 1999 and (arguably) again every time it received a security interest in Debtor's "accounts, inventory, equipment, and general intangibles" as part of a loan transaction. As reflected on a notation on the vehicle title, in 2011 Debtor, through Carl Brittain, assigned the rights to the vehicle to James Austin. The vehicle title submitted as an exhibit, though it may or may not be somewhat dated, appears to reflect that Debtor granted James Austin a security interest in the vehicle, albeit informally. There was nothing on the record indicating that James Austin's cash advances were used to actually pay off the debt secured by the vehicle, though he testified that he would not have loaned that money if he was not informed that the balance was paid. Heidi Brittain also testified the loan was paid. FFB was not notified of this transfer of interest. Payment of the balance of the secured debt held by FFB would have released the lien, but there was no tangible evidence that payment ever took place. The new security interest given to James Austin had no effect on FFB's prior security interest. "A security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest[.]" M.C.L. § 440.9315(a). FFB's security interest in this vehicle, insofar as it was not released in the event of payment in full, was prior to James Austin's purported security interest

17

and, further, it was properly attached and perfected. FFB's motion for relief from stay regarding the 1999 Dodge Ram is granted, insofar as FFB has a valid lien on it under applicable state law.

As to the second vehicle, in 2003 the Brittains obtained title to a 1998 Mack truck, which was used by Debtor. The title was issued to the Brittains individually and made no mention of Debtor. The first secured party is listed as a third party entity not associated with FFB. In 2009, the Brittains assigned their rights to James Austin, which he testifies was also formally transferred into his name, although such was not admitted into evidence. Nothing on the record indicated if this third party lienholder was paid off. FFB appears to claim that it has a secured interest in this vehicle by way of Debtor having granted it a security in the "accounts, inventory, equipment, and general intangibles" as part of the loan transactions. The vehicle was not legally part of Debtor's inventory or equipment, notwithstanding the vehicle's use in Debtor's business operations. Rather, it was the property of the Brittains individually. FFB never obtained a perfected security interest in this vehicle. The Brittains later transferred their interests to James Austin, subject to any valid third party liens. FFB's motion for relief from stay is denied regarding the 1998 Mack truck.

As to the third item, a 2003 Interstate trailer was titled to Debtor in 2003 and had no secured interest on record. In 2009, Debtor, through Carl Brittain, transferred title to this trailer to the Austins. Because the trailer became inventory and equipment of Debtor in 2003, prior to the transfer to the Austins, FFB attached and perfected a security interest to it as part of the secured promissory notes. FFB's prior security interest survived the transfer and continues to be in force, pursuant to M.C.L. § 440.9315(a). FFB's motion for relief from stay is granted regarding this trailer.

18

The two receipts issued by Debtor to the Austins evidencing the "loan-leaseback" arrangement (dating back 2009 and 2011) also referenced other items, including a 1996 Moffett forklift, a frontend loader Ford tractor, a TCM lift truck, a small portable scale, and an in-ground truck scale. Because the record indicates these items were inventory or equipment of Debtor and were thus subject to FFB's perfected security interest prior to the purported transfers of title to the Austins, FFB's prior security interest survived the transfer and continues to be in force, pursuant to M.C.L. § 440.9315(a). FFB's motion for relief from stay is granted regarding these items.

As evidenced by a different receipt dated November 22, 2011, the Austins, in exchange for their loans, were also given rights to "All in door landscaping furniture and nicknacks that are left. After 2011 will store and if can sell for them until they can find storage in Florida to open second hand store – paid in full by check to Zion 5,633.00 to keep building from foreclosure." (Exh. 44). James Austin, who was familiar with Debtor's operations and aware of its financial difficulties as early as 2009, testified that the stock of materials referenced in that receipt was not segregated and believed it remained for sale. The Austins argue that they qualify as buyers in the ordinary course because, according to James Austin's testimony, he believed he paid above market value. The Austins do not qualify as "buyers" in the ordinary course because the relevant statute states that "[a] person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt is not a buyer in ordinary course of business." M.C.L. § 440.1201(9). FFB's motion for relief from stay is granted regarding these items.

19

Tammi O'Shea is the Brittains' daughter and was formerly employed by Debtor. She testified she had invested some money into the business and was aware of Debtor's declining financial situation as early as 2009. She claims that she purchased various goods with her own money and stored them separately on Debtor's premises, including Christmas decorations, landscaping decorations, and various types of furniture. She testified that, during the month of January for some number of years, she would attend a trade show for the purpose (or at least partial purpose) of purchasing goods to be included in Debtor's inventory, and that if she found goods that she wanted for her *personal* use, she would buy them on Debtor's account and later reimburse Debtor for the cost. She testified that some of the goods were stored in the Debtor showroom, near her desk. She estimated this property to have a total value of about $5,000. Additionally, there were two crates of Christmas goods being stored in a nearby barn that was closed off to the public, with an estimated value of $900. The various items were detailed in lists submitted as exhibits. Some of the items remained in the original packaging. She testified that she intended to use all these goods for display in her residence and not for Debtor to sell. Her house had burned down around March 2009 but she intended to buy a new house. Around June 2012, she was in the process of moving from her apartment to her parents' house and apparently moved various landscaping and decorative items onto Debtor's premises.

During her employment at Debtor, Tammi O'Shea apparently embezzled money through a scheme in which she sold Debtor's inventory for cash, did not issue a receipt, and kept the proceeds. She testified paid restitution to Debtor in the amount of about $25,000. She testified she made these restitution payments using proceeds from the insurance settlement from her

20

house fire. She issued four cashier's checks to Debtor in the total amount of $6,918.50, two checks dated May 12, 2011 and two dated May 31, 2011, none containing a notation for the reason for payment. Tammi O'Shea maintains she was reimbursing Debtor for purchases she had made on its account. FFB argues that the payments are not reimbursements for personal purchases, but rather are more likely either restitution for her embezzlement or some form of investment into the business. FFB argues that Tammi O'Shea does not have superior interests because (a) the items were part of Debtor's inventory or equipment; and (b) at most, she may have been a consignor who failed to perfect her interest. Tammi O'Shea argues that the items were her own personal goods that were not commingled with Debtor's inventory, but rather were kept separately in unique and easily identifiable crates at certain locations. She also testified that some of the crates were marked with her name.

Tammi O'Shea has not met her burden of proof of persuading the Court that FFB is not entitled to relief from stay with regard to the above referenced items. These items, as reflected on Exhibits 19-22 are of the same character of the goods typically sold by Debtor, namely Christmas, Easter, and Thanksgiving decorations and various other home-goods. The number of goods is rather large, perhaps beyond what could be displayed at a single residence. The Court finds that the checks issued to Debtor were more likely *not* payments for goods she purchased on the business' account. The Court is not convinced that she made personal purchases on Debtor's account in January and reimbursed it in mid to late May. The payments were more likely restitution payments for her admitted embezzlement, or alternatively, an "investment" in Debtor to help it survive its difficult financial situation, of which Tammi O'Shea was admittedly aware. It is likely that she sought to assist the declining business by infusing cash into it, possibly using

21

her home insurance settlement proceeds. This probability is supported by the fact that Debtor had been given similar financial assistance by the Austins, who like Tammi O'Shea, were also family members of the Brittains and were also aware of Debtor's financial difficulties.

Some of her testimony conflicted with the more credible testimony of other witnesses. Nite Lites testified and produced a receipt indicating that on December 30, 2011 it purchased all the Christmas and Thanksgiving items in the "first cubby section in back area," the Christmas, Easter, and Thanksgiving items in the office area, and certain items and "miscellaneous gifts" located in the barn. (Exh. 14). Debtor sold these items to Nite Lites, without reservation and including some Christmas items located in the barn, which Tammi O'Shea argued belonged to her. This negates her claim that she had interests in those items. It could be that Debtor had the authority to sell Tammi O'Shea's items on her behalf. At most, she was a consignor who maintained personal effects on the premises with the understanding that Debtor could sell on her behalf. Accordingly, Debtor would be deemed to have acquired her rights in the items and FFB's security interest, which resulted from its perfection by filing, is senior to that of Tammi O'Shea. FFB's motion for relief from stay is granted regarding these items.

## Various Issues of Corporate Identity

There is some confusion regarding the identity of Debtor. As noted, the entity Hudson Brick Yard, Inc. was automatically dissolved under Michigan law in 2009. However, its principals, customers, and FFB all seemed to either be unaware or indifferent to that fact. Under Michigan law, dissolution did not terminate the corporate existence, but allows the business' continuation for its winding up. M.C.L. § 450.1833. Its principals and officers continue to function as if dissolution had not occurred. M.C.L. § 450.1834. The dissolution does not affect

22

a business' retention of title to its assets, nor its ability to sue or be sued. Id. Here, after its dissolution, Debtor continued operating under its corporate name and in its ordinary course of business, which in substance appears to have gone beyond winding up its affairs. Regardless of its technical dissolution, Debtor's business apparently continued as if such had not occurred, and importantly, it appears that the parties do not assert or rely upon this situation as affecting their rights or the Court's disposition of the issues.

Claimants initially argue that FFB had no perfected security interest in the Debtor property because the original 2007 UCC Filing Statement listed the secured creditor as "Bank of Lenawee" and thus only Bank of Lenawee had a perfected security interest in the Debtor assets. Claimants reason that, notwithstanding the 2008 merger of Bank of Lenawee into FFB, FFB did not perfect its security interest until it filed the UCC Filing Statement Amendment in 2012, which listed the secured creditor as FFB, and therefore FFB is unsecured as to any transfer or sale of inventory or equipment that took place prior to this amendment. Claimants cite no legal authority in support of this proposition.

In response, FFB argues that Bank of Lenawee was merged into and succeeded by FFB and that all of Bank of Lenawee's legal rights were transferred by operation of law as a result of the merger. The Articles of Combination evidencing the merger, submitted as Exhibit I, states in § 6.03:

> The Surviving Institution [FFB], without any order or action on the part of any court or otherwise and without any documents of assumption or assignment, shall hold and enjoy all of the assets, rights, privileges, powers, properties, franchises and interests… in the same manner and to the same extent as such rights, interests and powers were held or enjoyed by [FFB] and [Bank of] Lenawee, immediately prior to the Merger[.]

23

Further, 12 C.F.R. § 552.13, which is cited in the Articles of Combination as the legal basis for

the merger, states:

> Upon the effective date of a merger or consolidation under this section, if the resulting institution is a Federal savings association, all assets and property (real, personal and mixed, tangible and intangible, choses in action, rights, and credits) then owned by each constituent institution or which would inure to any of them, shall, immediately by operation of law and without any conveyance, transfer, or further action, become the property of the resulting Federal savings association. The resulting Federal savings association shall be deemed to be a continuation of the entity of each constituent institution, the rights and obligations of which shall succeed to such rights and obligations and the duties and liabilities connected therewith, subject to the Home Owners' Loan Act and other applicable statutes.

Although M.C.L. § 440.9511(3) states that "[a] person remains a secured party of record

until the filing of an amendment of the financing statement that deletes the person," Official

Comment 3 to that section elaborates:

> Application of other law may result in a person succeeding to the powers of a secured party of record. For example, if the secured party of record (A) merges into another corporation (B) and the other corporation (B) survives, other law may provide that B has all of A's powers. In that case, B is authorized to take all actions under this Part that A would have been authorized to take.

This Court finds that the situation exemplified in Official Comment 3 is identical to the one

at hand. Although the UCC Financing Statement stated "Bank of Lenawee," an entity that had

wholly merged into FFB, both the Articles of Combination and governing federal law provide

that the legal rights and obligations of Bank of Lenawee fully merged into FFB.

It is of no consequence that the UCC Financing Statement continued to identify a secured

creditor that had taken on a new name. "A financing statement substantially satisfying the

requirements of this part is effective, even if it has minor errors or omissions, unless the errors or

omissions make the financing statement seriously misleading." M.C.L. § 440.9506(1).

"Inasmuch as searches are not conducted under the secured party's name, and no filing is needed

24

to continue the perfected status of security interest after it is assigned, an error in the name of the secured party or its representative will not be seriously misleading."  M.C.L. § 440.9506 cmt. 2; see also Hon. Scott W. Dales et al., <u>Mich. Security Interests in Pers. Prop.</u> §4.14 (Inst. Continuing Legal Educ., 2010).  "A secured party that changes its name is not required to file either a new financing statement or an amended financing statement to reflect the name change." <u>NBD Bank, N.A. v. Timberjack, Inc.</u>, 208 Mich. App. 153, 162 (1994) (citation omitted).  Thus, as a matter of law, the unamended filing was sufficient to provide effective notice regarding the identity of the secured creditor.  It is a fact that Debtor and the Brittains also had *actual* notice of the new identity of their secured creditor because they renewed the Bank of Lenawee loans with FFB as early as August 2008.  Heidi Brittain testified at length that she actually became aware of the merger and the fact that FFB was the party to whom payment should be made.  Therefore, the UCC Financing Statement of April 10, 2007 represents the perfected security interests off FFB (as successor to Bank of Lenawee) in the subject promissory notes and security agreements, and the collateral covered thereby, notwithstanding the merger and the renewals of the loans, subject only to any superior interests of any third party claimants, such as those discussed in this opinion.

### CONCLUSION

    For the foregoing reasons, FFB's Motion for Relief from Stay is granted in part and denied in part.  FFB shall present an appropriate order under the applicable Local Rule.

                                                      .

**Signed on July 23, 2013**

                                        **_____/s/ Walter Shapero_____**
                                        **Walter Shapero**

25

**United States Bankruptcy Judge**

26